UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TONY E. SLUTSKY, | |
| Plaintiff, | Case No. 1:16-cv-1073 |
| v. | |
| JACOBSON COMPANIES, | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Tony Slutsky ("Plaintiff" or "Slutsky") is suing his former employer Jacobson Companies ("Defendant" or "Jacobson") for failure to accommodate, disability discrimination, and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. [5] at 1-5. Defendant has moved for summary judgment, and, for the reasons explained below, that motion [31] is granted.

**I.  Background**[1]

**A.  Plaintiff's Employment**

Defendant employed Plaintiff as a truck driver from October 2, 2014 until March 10, 2015. [50] at 1. Before Plaintiff began working for Jacobson, he was diagnosed with tendinitis in his right ankle, a condition that causes him extreme pain when he walks more than 100 feet. [54] at 1-2. When Slutsky was hired, he

---

[1] The facts are taken from the parties' Local Rule 56.1 statements. [33] refers to Defendant's statement of facts, and [50] contains Plaintiff's responses to Defendant's statement of facts. [54] refers to Plaintiff's statement of additional facts, and [64] contains Defendant's response to Plaintiff's statement of additional facts. This section also incorporates the parties' joint stipulation of additional facts [75], which was filed pursuant to the parties' representations in a Joint Status Report. *See* [74] at 1-2.

reported that he was able to perform the essential functions of the job without reasonable accommodation. [50] at 8.

Slutsky initially worked on the night shift, where he only drove diesel trucks. *Id.* at 10; *see also* [64] at 6. In February or March of 2015, Slutsky was offered a position on the day shift. [64] at 7. Around that same time, Jacobson replaced many of its diesel trucks with natural gas ("CNG") trucks. *Id.* at 3. Although both types of truck were equipped with air brakes, Plaintiff claims that the brakes in the diesel trucks were easier to push than those in the CNG trucks. *Id.* at 3. Plaintiff also claims that, shortly after Jacobson acquired the new CNG trucks, he requested an accommodation from Jacobson because he believed that his tendinitis would prevent him from safely braking in the new CNG trucks. *Id.* at 6. Specifically, Slutsky claims that he requested an accommodation by giving his supervisor, Heidi Ward ("Ward"), a doctor's note stating that he could only drive trucks with "power assisted brakes." *Id.*[2]

Plaintiff further claims that when Ward offered him a position on the day shift, she told him that if he accepted, he would "have to give up his accommodation" of driving diesel trucks and drive a CNG truck instead. [54] at 4. At that time, there were approximately nine trucks at Defendant's Romeoville location: three diesel trucks and six CNG trucks. [50] at 3. Ward testified that her decision to assign a driver to a particular truck was discretionary. [54] at 5.

---

[2] Defendant disputes the existence of the note and contends that Slutsky's allegations on this point are not supported by cognizable evidence. *See* [67] at 7. The Court declines to resolve this question, in light of its ultimate determination that Defendant is entitled to summary judgment on other grounds.

### B. Jacobson's Workplace Safety Rules

As a Jacobson truck driver, Plaintiff was required to follow all of Jacobson's policies, including its safety rules and regulations. [50] Ex. 2. Both Jacobson's workplace safety rules and Department of Transportation ("DOT") regulations require pre-trip and post-trip inspection reports. *Id.* at 7. Jacobson's workplace safety rules also require all employees to report any accidents or unsafe practices that occur on the job, regardless of their original cause. *Id.* Ex. 6. Jacobson's workplace safety rules further mandate that all trailer doors must be secured with bungee cords. *Id.* at 13. Slutsky was aware of these workplace safety rules during his employment with Jacobson. *Id.*

Defendant's policies also state that the company's disciplinary response to a rules infraction "typically" increases in seriousness until the infraction is corrected, and that the usual sequence of corrective actions proceeds from an oral warning, to a written warning, to probation, and culminates in termination of employment. [54] Ex. 4. That said, Defendant's policies also provide that: (1) the appropriate corrective action will be devised in light of "the seriousness of the infraction, the circumstances surrounding the matter, and the employee's previous record"; and (2) Jacobson will "immediate[ly] terminate" any employee who destroys company property. *Id.*

Ward testified that, as a practical matter, she never used probation as part of Defendant's progressive disciplinary process, [54] at 5; instead, her usual practice resembled a "three-strikes" system of increasingly severe warnings that culminated

3

in termination. [51-3] at 138:24-139:1 (Q: Jacobson utilizes a "three strikes, you're out, kind of thing. You're terminated, right?" A: "Correct.").

C. **Plaintiff's Violations of Jacobson's Safety Rules**

Slutsky first violated Jacobson's workplace safety rules on December 16, 2014. [54] at 5-6. At that time, Plaintiff was issued a "written warning" for failing to secure the doors of a Jacobson trailer, which caused the doors of the trailer to fall off. *Id.*

Plaintiff next violated Defendant's workplace safety rules on February 13, 2015, when he drove a truck that was later reported damaged by another employee. *Id.* Slutsky never reported any damage to the truck and claimed that the truck was not damaged when he returned it. *Id.* Jacobson subsequently launched an internal investigation into this February 13 incident. *Id.*

On February 25, 2015, Plaintiff again failed to secure the doors of his trailer, causing his trailer and a customer's loading dock to be damaged. *Id.* at 7. This third incident resulted in the issuance of a "final warning." *Id.*

On March 10, 2015, Jacobson informed Slutsky that it had completed its investigation into the February 13 incident, and determined that Slutsky was responsible for the damage to his truck.[3] [50] at 15. That same day, Ward

---

[3] Slutsky contends that he did not cause the damage to his truck on February 13, but he admits that: (1) the truck was damaged; (2) the security guard on duty the next day filled out a report documenting the damage to Slutsky's truck; and (3) Jacobson concluded that Slutsky had damaged his truck after conducting an internal investigation wherein Defendant reviewed video footage, interviewed multiple witnesses, reviewed information in Defendant's electronic database, and asked Slutsky to provide a report. [50] at 13-14. As discussed more fully *infra*, the material question before the Court today is whether Slutsky met Jacobson's legitimate expectations, and Slutsky's own evaluation of his work is insufficient to raise a question of fact on this issue. *See Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016) (The Seventh Circuit "has long championed an employer's

4

terminated Slutsky's employment, citing each of these three safety incidents as cause for his termination. *Id.* at 15-16.

### D. Plaintiff's Comparators

Three other non-disabled Jacobson employees are relevant to the parties' arguments here: James Huron ("Huron"), Carlos Pennix ("Pennix"), and Greg Bauman ("Bauman").

Huron, like Slutksy, was a truck driver with Jacobson whose employment was terminated after three safety incidents. On August 18, 2014, Huron received a "verbal and written communication" for failing to report possible damage to his truck. [64] at 13. On September 10, 2014, Huron received another "verbal and written communication" after his trailer made contact with another trailer, which he failed to report. *Id.* at 13-14. Finally, on September 30, 2014, Huron was terminated after he failed to properly document a pre-trip and post-trip inspection on a damaged truck. *Id.* at 14. Huron had also committed a non-safety rules violation the day before he was terminated; more specifically, he received a verbal warning for "calling off" of work on September 29, 2014. *Id.*

Pennix, meanwhile, committed two safety violations at Jacobson. *Id.* at 15. Pennix first received a "verbal and written communication" on August 11, 2014 when he caused damage to property while backing into an enclosed dock. *Id.*

---

right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions.") (citations omitted); *see also Brookins v. Chicago Transit Auth.*, No. 11-cv-2996, 2012 WL 4093382, at *4 (N.D. Ill. Sept. 14, 2012) ("An employee's self-serving statements about his ability are insufficient to contradict an employer's negative assessment of that ability.") (internal quotation omitted).

5

Pennix then received a "written warning" on February 20, 2015, after causing damage to his trailer. *Id.* Both parties presume that Pennix is still employed by Jacobson today. *See* [67] at 11.

Finally, Bauman was employed by Defendant as a driver from approximately November 2014 through March 3, 2015. [75] at 1-5. During the course of his employment, Bauman had three separate safety violations. *Id.* On December 1, 2014, Bauman was issued a verbal warning after he failed to seal his trailer before leaving the yard, resulting in freight falling off the back of his vehicle. *Id.* at 1. On February 9, 2015, Bauman received a written warning after he damaged a bumper while pulling out of a dock door. *Id.* at 2. Finally, on February 18, 2015, the front of Bauman's truck struck the back bumper of the driver in front of him. *Id.* at 5. This incident was memorialized in a written report dated February 20, 2015. *Id.*

In addition to these three safety violations, Bauman also made a racist comment in front of other employees on or around January 21, 2015. *Id.* Defendant's investigation into Bauman's comment was concluded on March 3, 2015, and he was terminated that same day. *Id.*

## II. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District,* 743 F.3d 524, 528 (7th Cir. 2014).

**III. Analysis**

Plaintiff's allegations involve three theories of liability: (1) a failure to accommodate; (2) disability discrimination; and (3) retaliation under the ADA. Plaintiff's repeated violations of Jacobson's workplace safety rules, however, undermine each claim, as more fully explained below.

**A. Failure to Accommodate**

To survive summary judgment on his failure to accommodate theory, Slutsky must adduce cognizable evidence from which a reasonable juror could conclude that: (1) he is a qualified individual with a disability;[4] (2) his employer was aware of his disability; and (3) his employer failed to reasonably accommodate the disability. *See Equal Employment Opportunity Commission v. AutoZone, Inc.*, 809 F.3d 916, 919

---

[4] Defendant argues that Plaintiff is not disabled under the ADA. This argument is rejected. Plaintiff has adduced colorable evidence suggesting that he suffers from tendinitis, such that he cannot walk more than 100 feet without extreme pain. [54] at 2. Thus, a reasonable jury could determine that he is substantially limited in the major life activity of walking, and, therefore, that he is disabled within the meaning of the ADA. *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 672 (7th Cir. 1998) (finding that tendinitis is a "physical impairment" under the ADA); *Street v. Ingalls Mem'l Hosp.*, No. 06-cv-2963, 2008 WL 162761, at *6 (N.D. Ill. Jan. 17, 2008) (finding that a reasonable jury could conclude that plaintiff's difficulty in walking only 100 to 300 feet at a time was a substantial limitation compared to the walking most people do daily).

7

(7th Cir. 2016). The ADA defines a "qualified individual" as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The Seventh Circuit, in turn, has held that an employee who fails to comply with universal workplace rules cannot, as a matter of law, establish that he performed the "essential functions" of his job. *See Budde v. Kane County Forest Preserve*, 597 F.3d 860, 863 (7th Cir. 2010) (plaintiff involved in crash while driving under the influence "was not 'qualified' to perform his job as police chief, based on his failure to comply with workplace rules and his inability to operate a vehicle"); *see also Payton v. Jewel Food Stores, Inc.,* 120 F. Supp. 3d 794, 799 (N.D. Ill. 2015) ("An employee who fails to comply with universal work place rules fails to perform essential job functions.") (citing *Budde*); *Ortiz v. Bd. of Educ. of City of Chicago*, No. 11-cv-9228, 2014 WL 3502640, at *3 (N.D. Ill. July 14, 2014) ("Defendant argues that [plaintiff's] violation of [defendant's] rules . . . renders him unqualified. The Court agrees. A violation of a workplace rule, even if caused by a disability, is no defense to discipline up to and including termination.") (internal citations and quotations omitted).

Here, it is undisputed that: (1) Jacobson's established workplace safety rules mandated that drivers like Plaintiff secure their trailer doors and report damage to their trucks; (2) violation of Jacobson's workplace safety rules could result in termination; and (3) Plaintiff knew about these rules and repeatedly violated the same. *See supra* at 3-4. This uncontroverted evidence establishes that Slutsky was

8

not performing the essential functions of his job, such that he was not a qualified individual within the meaning of the ADA, and his accommodation claim accordingly fails.

**B.     Discrimination**

Plaintiff pursues his disability discrimination claim under the "indirect" method of proof originally established in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). [53] at 11; *see also Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) (explicitly noting that "the burden-shifting framework" created by *McDonnell Douglas Corp. v. Green*, remains good law).[5] To make his *prima facie* case, then, Plaintiff must demonstrate that: (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *See Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014).

**1.     Jacobson's Legitimate Expectations**

Plaintiff failed to comport with Jacobson's workplace safety rules, *see supra* at 3-4, and he accordingly was not "meeting his employer's legitimate expectations." *See Cackovic v. HRH Chicago, LLC*, No. 12-cv-07386, 2014 WL 2893198, at *7 (N.D. Ill. June 26, 2014) (Plaintiff "cannot establish that she was meeting HRH's

---

[5] Whether direct or circumstantial, however, evidence must be considered "as a whole" and not "sorted into different piles." *Ortiz*, at 766. Ultimately, this Court must evaluate the overall likelihood of discrimination. In this regard, evidence is evidence, and the different types are just means to consider whether one fact (here, Plaintiff's disability) caused another (here, Plaintiff's termination). *See White v. Campanelli*, No. 14-cv-7215, 2017 WL 528380, at *3-4 (N.D. Ill. 2017) (*Ortiz* and *McDonnell Douglas* are "easily reconciled").

9

legitimate business expectations when she was terminated for violating company policies by taking an unauthorized break in a guest room and failing to advise her supervisor of taking a break."); *Anderson v. Jewel Food Stores, Inc.*, 837 F. Supp. 2d 826, 833 (N.D. Ill. 2011) (Plaintiff "has not presented evidence raising a genuine dispute as to any material fact that she was meeting Jewel's legitimate job expectations because she violated the food handling and coding policies in May 2008."); *Toussaint v. Sheriff of Cook Cty.*, No. 97-cv-7866, 2000 WL 656642, at *5 (N.D. Ill. Mar. 23, 2000) ("Once [plaintiff] failed the drug test, he no longer met his employer's legitimate expectations because he violated his employer's zero-tolerance anti-drug policy."). Since Slutsky was not meeting his employer's legitimate expectations, Defendant is entitled to summary judgment on his disability discrimination claim.

## 2. No Disparate Treatment

Plaintiff attempts to avoid the foregoing result by invoking *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319 (7th Cir. 2002), and its progeny. *See* [53] at 12. In *Peele* the Seventh Circuit acknowledged that "the legitimate expectations of an employer may themselves be tainted by discrimination." *Michel v. Princeville Cmty. Unit Sch. Dist. #326 Bd. of Educ.*, 317 F.R.D. 555, 560 (C.D. Ill. 2016) (discussing *Peele*). To remedy this issue, the Seventh Circuit explained that when "a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner . . . the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a prima facie case, stave off

summary judgment for the time being, and proceed to the pretext inquiry." *Peele*, 288 F.3d at 329.

Merger of these elements is only appropriate, however, "in limited circumstances." *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002). The "comparator employees" relied upon by the Plaintiff "must still be 'similarly situated' to" him. *Michel*, 317 F.R.D. at 560. Practically, Plaintiff must show that the comparator employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peele*, 288 F.3d at 330 (internal quotation omitted); *see also Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010) ("declin[ing] to merge the second and fourth prongs and proceed to the pretext inquiry because [plaintiff] does not support that allegation with any actual evidence of disparate application").

Plaintiff here specifically argues that merger is appropriate, in light of Defendant's more favorable treatment of Huron, Pennix and Bauman. [53] at 12-13; [78] at 1-5. Plaintiff is mistaken, as discussed more fully below.

### a) Huron

Huron, like Plaintiff, was terminated after three violations of Defendant's workplace safety rules. *See supra* at 5. Plaintiff nevertheless argues that Huron received preferential treatment because Huron committed an additional attendance policy violation before he was terminated by Jacobson. [53] at 12-13.

Plaintiff's evidence regarding Huron is simply not "sufficient to raise an inference" that Jacobson "applied its legitimate expectations in a disparate manner." *Peele*, 288 F.3d at 329. By the last week of September 2014, Huron had already committed two safety violations. *See supra* at 5. Huron then violated the attendance policy on September 29, 2014, and he was fired after he committed a third safety violation *the very next day. Id.* At bottom, Huron, like Slutsky, committed three safety violations, and Huron, like Slutsky, was terminated. *Id.* The fact that Huron committed an additional rules violation one day before his termination is not sufficiently suggestive of disparate treatment to justify merger of the *McDonnell Douglas* elements. *See Feaster v. Greyhound Lines, Inc.*, 173 F. App'x 499, 502 (7th Cir. 2006) (Plaintiff's comparator insufficient to make out *prima facie* case under *McDonnell Douglas*, as comparator was "also fired at about the same time, so he was not treated more favorably."); *Thomas v. Norfolk S. R. Co.*, No. 09-cv-7383, 2013 WL 791449, at *7 (N.D. Ill. Mar. 4, 2013) (Plaintiff did "not demonstrate that other [non-disabled] employees were treated more favorably: [the putative comparator] was also fired for a similar offense just three months before [plaintiff].")

### b) Pennix

Plaintiff next suggests that Pennix was also treated more favorably than him, insofar as Pennix received a "written warning" after his second violation, as opposed to a "final warning." [53] at 13. Here again, this distinction is not "sufficient to raise an inference that" Jacobson "applied its legitimate expectations in a disparate

manner." *Peele*, 288 F.3d at 329. Slutsky committed three violations, and he was terminated; Pennix committed two violations, and he was not. *Id.* at 3-5. Pennix and Slutsky are simply not similarly situated. *See Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690-91 & n. 7 (7th Cir. 2008) (employees not similarly situated where plaintiff engaged in more misconduct than purported comparators); *Logan v. Caterpillar, Inc.,* 246 F.3d 912, 920 (7th Cir. 2001) (employees not similarly situated where would-be comparator committed only one of the three offenses for which plaintiff was fired).

### c) Bauman

Bauman, for his part, was also terminated after three violations of Defendant's workplace safety rules. *See* [75] at 1-5. Plaintiff nevertheless insists that Bauman received preferential treatment because Bauman was terminated after Defendant concluded its investigation into Bauman's racist comment, approximately two weeks after Bauman's third workplace safety violation. [78] at 3.

Plaintiff's reliance upon Bauman is misplaced. As a preliminary matter, Bauman is not "similarly situated" to Plaintiff. Bauman committed both his second and his third workplace safety violations *after* Defendant had begun investigating Bauman's racist comment. *See supra* at 6. Plaintiff, conversely, was only ever subject to discipline for his workplace safety violations. *See supra* at 3-4. The complicating presence of Defendant's investigation, and Defendant's apparent desire to conclude the investigation prior to terminating Bauman, are

13

"differentiating or mitigating circumstances [sufficient to] distinguish their conduct or the employer's treatment of them." *Peele*, 288 F.3d at 330; *see also Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 595 (7th Cir. 2010) (affirming summary judgment for defendant employer and explaining that plaintiff failed to show that there were similarly situated comparators who received favorable treatment, where there was no evidence that alleged comparators violated employer's policies to the degree that plaintiff did or that they had trouble completing their work the way plaintiff did).

Bauman is also an unavailing comparator because, as Defendant rightly points out, Bauman was not treated "more favorably" than Plaintiff—they were both fired. *See supra* at 5-6; *see also Feaster*, 173 F. App'x at 502 (Plaintiff's comparator insufficient to make out *prima facie* case under *McDonnell Douglas*, as comparator was "also fired at about the same time, so he was not treated more favorably.").

Ultimately, Plaintiff's putative comparators were either: (1) fired, after committing the same number of safety violations as Plaintiff, such that there is no evidence of more favorable treatment; or (2) not fired, after committing fewer safety violations than Plaintiff, such that the ostensible comparator is not similarly situated to Plaintiff. This case is accordingly not one of the "limited circumstances" in which a court is authorized to merge the *McDonnell Douglass* factors. *Brummett*, 284 F.3d at 745.

### C. Retaliation

Finally, in order to articulate a valid "retaliation claim under the ADA, an employee must show that he was meeting his employer's legitimate employment expectations, and that he was performing his job satisfactorily." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011). As discussed *supra*, Plaintiff repeatedly violated Defendant's workplace safety rules, such that he was neither meeting Jacobson's legitimate expectations nor performing his job satisfactorily. *See supra* at 3-4. Jacobson is accordingly granted summary judgment on Plaintiff's retaliation claim.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [31] is granted. The Clerk is directed to enter Rule 58 judgment in favor of Defendant and against Plaintiff. Civil case terminated.

Date: June 29, 2017

Entered:

_____
John Robert Blakey
United States District Judge